**UNITED STATES of America, Plaintiff,**

**v.**

**Da-Chuan ZHENG, Kuang-Shin Lin, David Tsai, Kwong Allen Yeung, and Jing-Li Zhang, Defendants.**

**Crim. A. No. 84–64.**

United States District Court, D. New Jersey.

July 26, 1984.

---

W. Hunt Dumont, U.S. Atty., by Robert J. Fettweis, and Anne C. Singer, Asst. U.S. Attys., Newark, N.J., for plaintiff.

Weissbard & Wiewiorka by Harvey Weissbard, and Edward Wiewiorka, West Orange, N.J., for defendant David Tsai.

Susan V. Tipograph, New York City, for defendant Jing-Li Zhang.

Robinson, Wayne, Levin, Riccio & LaSala by John D. Arseneault and Alan L. Zegas, Newark, N.J., for defendant Da-Chuan Zheng.

Miller, Hochman & Meyerson by Gerald D. Miller, and Seymour Margulies, Jersey City, N.J., for defendant Kwong Allen Yeung.

Margulies, Margulies & Wind by Robert E. Margulies, Jersey City, N.J., for defendant Kuang-Shin Lin.

## OPINION

SAROKIN, District Judge.

The court here confronts a difficult and highly technical problem involving the propriety of regulations implementing a criminal statute. Underlying this specific issue, however, are more fundamental principles regarding the creation of criminal liability, the extent to which a defendant's subjective belief in the criminality of his or her acts affect such liability, and the compliance by the Executive branch with congressional directives regarding what may be made a crime and what may not.

On February 23, 1984, defendants Da-Chuan Zheng, Kuang-Shin Lin, David Tsai, Kuang Allen Yeung and Jing-Li Zhang were charged in a one-count indictment with conspiracy to violate the Arms Export Control Act, 22 U.S.C. § 2778 ("the Act"), and regulations promulgated pursuant thereto, all in violation of 18 U.S.C. § 371. In particular, the indictment alleges that defendants conspired to arrange for the export of certain radar jamming devices, known as wave tube amplifiers, to the People's Republic of China. The arrest of defendants culminated an approximately two-week long undercover investigation conducted by the United States Customs Service.

By opinion filed May 23, 1984, the court addressed defendants' various pretrial motions. One such motion sought dismissal of the indictment in this matter on the grounds of the vagueness of the Act and the regulations promulgated pursuant thereto. 22 C.F.R. § 121.01 *et seq.* ("the Munitions List"). Defendants argued that the section of the regulations within which the government claims wave tube amplifiers fall, 22 C.F.R. § 121.01, Category XI(a)(1)(d) (naming "active and passive countermeasures and counter-countermeasures" or "components" thereof), was unconstitutionally vague, since, as defendants

then argued "[t]o think that a person of ordinary intelligence would understand that wave tube amplifiers are prohibited items under Category XI of the Munitions List, defies logic." Pretrial Brief of Defendant Zheng at 4. The court, however, reserved decision on this issue, because of its inability to determine "whether or not wave tube amplifiers are reasonably encompassed within the term countermeasure in the eyes of the average arms exporter." *United States v. Zheng*, Crim. No. 84-64, unpub. op. at 5 (D.N.J. May 23, 1984) ("*Opinion*"), as well as the court's duty to evaluate vagueness challenges "in light of the particular facts at hand," *id.* at 6, especially where specific intent is a necessary element of the offense charged. *Id.* at 6–7.

Upon reconsideration, defendants do not, for the most part, dispute this holding. Rather, they now argue that, because Congress required that specific "items" be made a part of the Munitions List, *see* 22 U.S.C. § 2778(a)(1),[1] and because this statutory mandate was ignored in designating a generic category, "countermeasures," rather than more specific items such as wave tube amplifiers, such generic category must be deemed a nullity, and the indictment based upon it dismissed.

This argument is, of course, conceptually distinct from that regarding vagueness: at issue here is the Executive's obedience or disobedience of a congressional mandate, and not the objective clarity of the statute or regulations thus promulgated.[2] As the court noted in its opinion, such argument is irrelevant to a vagueness challenge. The court did, however, state that such argument "may" have factual merit, though it questioned defendants' standing to raise it. *Opinion* at 5 n. 3. Upon motion for reconsideration, and supplemental briefs ordered by the court, the issue is clearly presented and thoroughly briefed for the first time. The court here addresses it, and for the reasons set forth below, dismisses the instant indictment.

First, there is no question but that the term "countermeasure" does not constitute an "item." "Item" is defined, for these purposes, as "an individual particular or detail singled out from a group of related particulars or items." *Webster's Third New International Dictionary of the English Language Unabridged* ("*Webster's*") at 1203 (1976). "Countermeasures" or "counter-countermeasures" and their "[c]omponents, parts, accessories, attachments and associated equipment ...," 22 C.F.R. § 121.01, Category XI(a)(1), (d), even limited to those associated with "Military and Space Electronics," and even read in the context of the paragraph in which it appears,[3] comprise a "group of related par-

---

1. Title 22 U.S.C. § 2778(a)(1) states:
   The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the United States Munitions List.
   This section, and related provisions, are discussed in further detail, *infra*.

2. Defendants raised this issue for the first time in reply, *see* Reply Brief of Defendant Zheng at 3–4; Letter Brief of Defendant Zheng (5/1/84), and the matter was discussed at oral argument. All prior discussion took place within the context of a challenge to the Act on grounds of vagueness.

3. That paragraph reads, in full.
   (1) Underwater sound equipment including long towed arrays, electronic beam forced sonar, target classification equipment, and spectrographic displays; search, acquisition, tracking, moving target indication and imaging radar systems; active and passive countermeasures, counter-countermeasures; electronic fuses; identification systems; command, control and communications systems, and regardless of destination, any experimental or developmental electronic equipment specifically designed or modified for military application, or for use with a military system ...
   22 C.F.R. § 121.01, Category XI(a)(1). Although the government fails so to contend, the content of this paragraph could be argued to narrow the term "countermeasures" somewhat: read fairly, the term could not, for example, be said to encompass anti-aircraft devices, which might also be considered "countermeasures." Nonetheless, the term "countermeasure" is not an "item." Rather it is a category, the components of which would themselves be items, perhaps including wave tube amplifiers, which served to "counter, check, or offset," *Webster's* at 520, some military or space electronic technology.

ticulars and items," and not the "individual particular or detail" itself. It is true, as the government argues, that in order to be an "item," an object need not be the "'most particularized' possible thing." Government's Supplemental Brief at 5. Indeed, the government is correct that an "item" need not be as specific as a "particular." As *Webster's* states, in discussing "item" and its synonyms:

> ITEM, DETAIL AND PARTICULAR can signify one of the things, either separate and distinct or so considered, that constitute a whole. ITEM applies chiefly to each thing in a list of things or in a group of things that lend themselves to listing. DETAIL in this connection applies to each separate thing which enters into the building, form, or construction of something as a house, a painting, narrative, or operation. PARTICULAR in this connection implies a relationship with any whole and stresses that relationship more than ITEM or DETAIL, emphasizing the smallness, singleness, and concreteness of each item or detail in the whole ...

*Webster's* at 1203 (capitals in original) (examples omitted). Nor, however, is an "item" as broad as a "category" or "group" from which items are derived. Hence, what is an "item" and what is a "particular" on the one hand, or a "group" on the other, is always relative. The government is correct that an "item" may always be further itemized, making it appear to be a "group" or "category," or it may be viewed in the larger context of the group of which it is a part. Thus, to use the government's example, "horses" can be identified "as jumpers, workhorses, racehorses and pleasure horses, or ... further 'itemized' by more detailed breeds such as quarter horses, thoroughbreds, palominos, appaloosas, Clydesdales, etc.," Government's Supplemental Brief at 5. Of course, "horses" could also be thought of as "items" within the "group" of "quadripeds," "mammals" or even "living things." Which is the group and which is the item is therefore a matter of judgment and ought normally to be determined with regard to the legislative context in which the words appear.

That legislative context lends powerful support to defendants' arguments, as discussed, *infra*. However, the court need only rest its conclusion upon common sense. "Countermeasures" is simply too broad a description to be considered an "item"; to require greater specificity is not to mandate undue particularization, but to require the Executive merely to promulgate a list of "items" in conformity with the Act. This conclusion derives additional authority from the fact that wave tube amplifiers, in the words of *Webster's*, *supra*, "lend themselves to listing." As defendants point out, wave tube amplifiers themselves are specifically listed elsewhere in the Code of Federal Regulations, *see* 14 C.F.R. § 171.323, and have been the subject of inquiry by the United States Air Force Scientific Advisory Board Ad Hoc Committee on Traveling Wave Tube Amplifiers, *see* 46 Fed.Reg. 7427 (January 9, 1981); 46 Fed.Reg. 14374 (February 18, 1981) (investigating wave tube amplifier reliability), and by the Department of Commerce, International Trade Administration, *see* 46 Fed.Reg. 63364 (December 31, 1981) (investigating alleged dumping of wave tube amplifiers by Japanese manufacturers). Moreover, even the government admits that "wave tube amplifiers are common components of several other equipment types" described in 22 C.F.R. § 121.01, Category XI(a)(1). Government's Brief in Opposition to Pretrial Motion by Defendants at 13.

Furthermore, although the government continues to argue that requiring the List to include such specific "items" as wave tube amplifiers "would be cumbersome and difficult" and "would be to require a list much more static at any one point in time than would be wise in this world of fast-changing technology," Government's Supplemental Brief at 6, such argument is undercut by the many extremely detailed sections of the list that already exist. Hence, for example, the "chemical agents" listed in Category XIV(a) are specified in

excruciating detail in 22 C.F.R. § 121.09, and even such terms as "vessels of war" and "aircraft" are defined with extraordinary specificity in 22 C.F.R. §§ 121.13, 121.14. Moreover, the face of the list, while not perfect, is replete with designations far more specific than "countermeasures." Within Category XI itself, terms like "simple fathometers" or "electro-mechanical beam former sonars and elementary sonobuoys" certainly describe "items," without apparently sacrificing the practicability or flexibility of the List. 22 C.F.R. § 121.01, Category XI(b). Even "aerial cameras, space cameras, special purpose military cameras, and specialized processing equipment therefor ...," 22 C.F.R. § 121.01, Category XIII(a), is a listing far more specific than "countermeasures," and obviously adequate under the Act. *See United States v. Swarovski*, 592 F.2d 131 (2d Cir.1979). In sum, the court is convinced that the Munitions List could describe "items" within the category that is "countermeasures" without unduly burdening the Executive responsible for constituting the list or preventing modification thereof on a reasonably frequent basis.

The Act requires that the United States Munitions List be composed of items. By its terms

> The President is authorized to designate those *items* which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services. The *items* so designated shall constitute the United States Munitions List.

22 U.S.C. § 2778(a)(1) (emphasis added). Similarly, the most recent amendment to the Act provides:

> The President shall periodically review the *items* on the United States Munitions List to determine what *items*, if any, no longer warrant export controls under this section. The results of such reviews shall be reported to the Speaker of the House of Representatives and to the Committee on Foreign Relations and the Committee on Banking, Housing and Urban Affairs of the Senate. Such a report shall be submitted at least 30 days before any *item* is removed from the Munitions List and shall describe the nature of any controls to be imposed under the Export Administration Act of 1979 (50 U.S.C.App. 2401 *et seq.*). ·

(emphasis added). It is thus clear that the United States Munitions List is to be composed of "items," which items are themselves to be subject to periodic review and, if appropriate, deletion from the list. Additionally, the Executive must make quarterly reports of all export licenses issued for "major defense equipment, by category, sold for $1,000,000 or more," which reports are to list

> (A) the *items* to be exported under the license,
>
> (B) the quantity and contract price of each such *item* to be furnished, and
>
> (C) the name and address of the ultimate user of each such *item*.

22 U.S.C. § 2776(a)(4) (emphasis added).

The congressional mandate that the Munitions List be composed of "items" is not coincidental. For example, the commodity control list, which is to be promulgated by the Secretary of Defense according to the terms of the Export Administration Act of 1979, does not require a listing of "items," but rather "a list of all goods and technology ... clearly identified as being subject to controls under this section." 50 U.S.C. App. § 2404(c)(1). That the Export Administration Act speaks in the broader terms of "goods and technology" throughout is further consistent with that Act's less stringent reporting requirements: rather than the quarterly requirements imposed by the Arms Export Control Act, 22 U.S.C. § 2776(a)(4), the Secretary of Defense need only report on "general licensing activities," and other aspects of the administration of the Export Administration Act annually. 50 U.S.C.App. § 2413. Similarly, while no reporting requirements are imposed upon the Secretary of Defense who wishes to delete goods or technology from the commodity control list, prior to such deletion, *see* 50 U.S.C.App. § 2404(c)(3), (g),

the President must alert Congress thirty days before an item is removed from the Munitions List. 22 U.S.C. § 2778(f). Hence, it is clear that Congress demanded particularly rigorous oversight of the Munitions List: one of the ways it did this was by requiring that the list be made up of discrete items, as to which the strict review mandated was far more practicable.[4]

More important, perhaps, are the goals that these two acts share. The Export Administration Act of 1979, 50 U.S.C.App. § 2401, *et seq.*, had the effect of amending various portions of the Arms Control Export Act, 22 U.S.C. § 2778(e). That Act also stated that

> The authority granted to the President in this Act shall be exercised in such a manner as to achieve effective coordination with the authority exercised under section 38 of the Arms Control Export Act (22 U.S.C. 2778).

50 U.S.C.App. § 2416(b). *See also* 22 U.S.C. § 2778(e). The legislative history of the Export Administration Act demonstrates that one of its primary purposes was to keep the number of goods and technologies upon which export limitations were to be imposed to a minimum, to "provide authority to control exports where necessary, but also [to] ensure that such authority is exercised with maximum efficiency and controls are confined to those necessary to achieve the purposes of the act." S.Rep. No. 96-169, 96th Cong., 1st Sess. at 2 (1979), *quoted in* U.S.Code Cong. & Adm. News 1147, 1148-49 (1979). The legislation was said by the Senate to be

> necessary to improve the efficiency of export licensing and to provide for periodic and systematic review and revision of export control policy to insure that controls are achieving their intended purposes, are not excessive, and are focused on items for which export control is most in the national interest.

S.Rep. No. 96-169, *supra*, at 2, U.S.Code Cong. & Admin.News 1979, p. 1148. The necessity for this legislation stemmed, at least in part, from the fact that

> Uncertainty over U.S. policy toward the use of export controls for foreign policy purposes has discouraged potential exports and tarnished the reputation of U.S. exporters as reliable suppliers to foreign countries. Controls applied for foreign policy reasons often restrict the export of goods and technology freely available from foreign suppliers, often from our allies. Yet there is no evidence that the effects of such controls are receiving due consideration, nor that efforts are being made to obtain agreement by our allies to adopt similar restrictions on their exports.

S.Rep. No. 96-169, *supra*, at 3, U.S.Code Cong. & Admin.News 1979, p. 1149. Hence, the Export Administration Act was clearly designed to assure that export controls be, in the words of former Under Secretary of State George Ball, "used very sparingly." *Id.* at 6. *See also* House Conference Report No. 96-482, 96th Cong., 1st Sess., *quoted in*, U.S.Code Cong. & Adm. News, *supra*, at 1180. Both this Act and the Arms Control Export Act were to be administered accordingly. With respect to the Export Administration Act, such administration required the Executive Branch to utilize certain criteria when "imposing, expanding, or extending export controls under this section", 50 U.S.C.App. § 2405(b),[5] and to consider other factors in deciding whether to grant "hardship relief" from such controls. 50 U.S.C.App. § 2411(e). With respect to the Arms Control Export Act, both a limitation upon the scope of the statute and the notice to be given by it were to be enhanced by the requirement that "items" be listed, rather than either the "goods or technology" of the Export

---

**4.** Indeed, it is clear that congressional oversight was a motivating factor behind the 1981 amendment to the Act which added § 2778(f). *See* 1981 U.S.Code Cong. & Adm.News 2404, 2407, 2412-15 (discussing P.L. 97-113, of which § 2778(f) was § 107).

**5.** These factors were very similar to those that Congress had in mind when passing the Arms Control Export Act. *See* H.R. No. 94-1144, 94th Cong., 2d Sess. (1976) at 12-13 (remarks of Secretary of State Kissinger), *quoted in* 1976 U.S.Code Cong. & Adm.News 1378, 1389.

Administration Act or the "articles which shall be considered as arms, ammunition and implements of war" of the predecessor to the Arms Export Control Act. 22 U.S.C. § 1934.[6]

In sum, the court concludes that congressional use of the term "item" engendered a purposeful choice of words. It meant to enhance the detail of the Munitions List, making possible greater congressional oversight of the Executive in this area. It also meant to increase the quality of the notice available to potential exporters, and thereby remove unnecessary barriers to exporting goods which might arise from the chilling effect that necessarily attends less clear regulation.[7] Thus, important social policies were to be served by the use of the term "item" in the Act. The question that remains is the effect of the Executive's failure to name as an "item" the defense article which defendants allegedly conspired to export without a license.

■ Where the Executive fails to adhere to the statutory mandate applicable to his or her actions, the actions thus taken or regulations thus promulgated are rendered "a nullity." *United States v. Larionoff,* 431 U.S. 864, 873 and n. 12, 97 S.Ct. 2150, 2156 and n. 12, 53 L.Ed.2d 48 (1977), citing *Manhattan General Equipment Co. v. Commissioner,* 297 U.S. 129, 134, 56 S.Ct. 397, 400, 80 L.Ed. 528 (1936). *See also Campbell v. Galeno Chemical Co.,* 281 U.S. 599, 610, 50 S.Ct. 412, 415, 74 L.Ed. 1063 (1930); *Atchison, Topeka & Santa Fe Railway Co.,* 607 F.2d 1199, 1203 (7th Cir. 1979); *City of Santa Clara v. Andrus,* 572 F.2d 660, 677 (9th Cir.1978); *United States v. Silva,* 272 F.Supp. 46, 49–50 (S.D.Cal. 1967). As such they may not support a prosecution. *See, e.g., Adamo Wrecking Co. v. United States,* 434 U.S. 275, 98 S.Ct. 566, 54 L.Ed.2d 538 (1978) (regulation exceeding congressional mandate); *McKart v. United States,* 395 U.S. 185, 189–92, 89 S.Ct. 1657, 1660–62, 23 L.Ed.2d 194 (1969) (administrative action exceeding congressional mandate). *Cf., United States v. Gurrola-Garcia,* 547 F.2d 1075, 1077 (9th Cir.1976) (22 C.F.R. § 127.01 would not serve as a basis for conviction if it extended or modified the predecessor to the Act, which it did not do in this case). This is true whether the regulation or action at issue is substantive, *see, e.g., Adamo Wrecking Co., supra,* 434 U.S. at 285, 98 S.Ct. at 573 (question of what comprises an "admission standard" under the Clean Air Act); *United States v. W.T. Rawleigh Co.,* 267 F.2d 180, 184 (7th Cir.1959) (interpretation of Internal Revenue Code, and regulations), or procedural. *See, e.g., United*

**6.** Title 22 U.S.C. § 1934 stated, in full:

The President is authorized to control, in furtherance of world peace and the security and foreign policy of the United States, the export and import of arms, ammunition and implements of war, including technical data relating thereto, other than by a United States Governmental agency. The President is authorized to designate those articles which shall be considered as arms, ammunition and implements of war, including technical data relating thereto, for the purposes of this section.

When Congress enacted the current Arms Control Export Act, it changed, *inter alia,* the language "articles which shall be considered as arms, ammunition and implements of war" to "items which shall be considered as defense articles and defense services." Though the parties have pointed to no legislative history behind such change and although "item" is nearly synonymous with "article", *see Webster's* at 123, the structure of 22 U.S.C. § 2778 makes it apparent that "items" are a subset of "defense articles and defense services," and thus more specific than either. In other words, because the list was to contain "items" which are "defense articles," it would make little sense to use the former term unless it were more specific than the latter. This is also consistent with *Webster's,* since the dictionary definition of "item" connotes a specificity which "article" does not. In any event, the change in the statute reveals an intentional movement to the word "item" in 1976.

**7.** The importance of breaking down such barriers to trade with the People's Republic of China, to which defendants sought to export wave tube amplifiers, has been reinforced by the events of the past decade, as reflected in regulatory changes. *See, e.g.,* 48 Fed.Reg. 53064 (Nov. 23, 1983) (implementing "a more liberal export control policy toward the People's Republic of China"); 46 Fed.Reg. 60820 (Dec. 14, 1981) (deleting the People's Republic of China "from the list of countries which are denied licenses and other approvals by the U.S. Department of State for U.S. Munitions List exports").

*States v. Finley Coal Co.*, 493 F.2d 285, 291 (6th Cir.), *cert. denied,* 419 U.S. 1089, 95 S.Ct. 679, 42 L.Ed.2d 681 (1974) ("[a]dministrative rule-making in disregard of procedural requirements is ultra vires"), citing *Texaco, Inc. v. Federal Power Commission,* 412 F.2d 740, 746 (3d Cir.1969); *Hotch v. United States,* 212 F.2d 280, 283–84 (9th Cir.1954).

Here, as defendants argue, it is both. In failing properly to "itemize," the Executive did not make the unlicensed export of wave tube amplifiers, or other items within the category "countermeasures," a crime under 22 U.S.C. § 2778(c); this is a substantive failing akin to that requiring dismissal of the indictment in *Adamo Wrecking, supra.* Arguably, the Executive also failed to promulgate the pertinent regulations in their proper form; this was a procedural shortcoming, similar to that resulting in nullification in *Finley Coal.*[8] These failings, which the government characterizes as based upon a "hypertechnical and artificial ... reading of the word 'item'", Government's Supplemental Memorandum at 8–9, are fatal in the criminal context, where the rule is that "where there is ambiguity ..., doubts are resolved in favor of the defendant." *Adamo Wrecking Co., supra,* 434 U.S. at 285, 98 S.Ct. at 573, citing *United States v. Bass,* 404 U.S. 336, 348, 92 S.Ct. 515, 523, 30 L.Ed.2d 488

(1971). *See also United States v. Laub,* 385 U.S. 475, 480, 486–87, 87 S.Ct. 574, 580–81, 17 L.Ed.2d 526 (1967) (statute did not authorize area restrictions which could not, therefore, support an indictment); *United States v. Eaton,* 144 U.S. 677, 687–88, 12 S.Ct. 764, 767, 36 L.Ed. 591 (1892). Nor, in situations such as these, are administrative regulations entitled to their normal presumption of regularity, as argued by the government. *See, e.g., SEC v. Sloan,* 436 U.S. 103, 117, 98 S.Ct. 1702, 1711, 56 L.Ed.2d 148 (1978); *Weyerhaeuser Co. v. Costle,* 590 F.2d 1011, 1027 (D.C.Cir. 1978); *United States v. Finley Coal Co., supra,* 493 F.2d at 290–91. *Cf., McKart v. United States, supra,* 395 U.S. at 197–99, 89 S.Ct. at 1664–65 (exhaustion of administrative remedies not required where statutory interpretation is at issue).[9]

This analysis leads the court to but one conclusion: the terms "countermeasures, counter-countermeasures" in 22 C.F.R. § 121.01, Category XI(a)(1) are a nullity. As they are the basis for the instant indictment, such indictment must in turn be dismissed. This is true irrespective of defendants' knowledge, belief or actual subjective understanding of the wrongfulness of their acts, for what is not a crime cannot be made one simply by virtue of one's impressions, however, accurate or misguided they may be. *See Hotch v.*

---

8. Cases like *Finley Coal* describe situations in which regulations are invalidated for failure to adhere to the required procedures for rulemaking. Such cases are applicable by powerful analogy. Here, the Executive did not adhere to the procedure for making a defense article or service part of the list: the article must be identified as one which belongs on the list, and then sufficiently specified so as to become an "item." The function of such procedure, like those in *Finley Coal,* is to provide the requisite notice to those potentially affected. *See supra* at 277–78.

9. The cases cited by the government all involve situations in which particular regulations were upheld by the courts as not inconsistent with the substance and purposes of the statute at issue. *See, e.g., Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973) (regulations under Truth in Lending Act), citing *Thorpe v. Housing*

*Authority of the City of Durham,* 393 U.S. 268, 280–81, 89 S.Ct. 518, 525–26, 21 L.Ed.2d 474 (1969). That is not the issue here before the court: indeed, the court might well concede that wave tube amplifiers belong on the Munitions List, and that to hold otherwise would be unduly to restrict the power of the Executive. However, in order to support an indictment and possible conviction, wave tube amplifiers must be placed on the list in the manner prescribed by the statute, as "items." Such itemization is itself consistent with the language and purposes of the statute, as discussed, *supra,* matters as to which even the cases cited by the government hold the court need not defer to the administrator. *See Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) (deference is more in order when the construction of a regulation rather than the statute is at issue). Nor does any degree of deference allow the court to reach the conclusion that the term "countermeasures" constitutes an "item."

*United States, supra,* 212 F.2d at 284–84. Unlike the vagueness inquiry which, the court has noted, depends upon "the particular facts of the case at hand, including the conduct of the defendants," *Opinion* at 6 (citing cases), the issue here before the court in no way involves defendants' understanding. Rather, the question is simply one of whether the Executive has failed to comply with his or her legislative mandate. The matter is thus one of statutory construction, and not of due process, which is the basis of a vagueness challenge. *See, e.g., Hoffman Estates v. Flipside,* 455 U.S. 489, 497, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). To require an inquiry into defendants' respective states of mind would thus be to engage in non-sequitur and to inject into the issue of Executive authority the myriad beliefs of all those affected by a particular statute. No court has yet held such beliefs relevant to an analysis such as this one; this court thus concludes that the issue of defendant's standing to raise this claim is unproblematic in this context.

CONCLUSION

Although what is at issue here may appear to be a highly technical reading of a regulation implementing a criminal statute, it actually involves the fundamental principle that no person may be charged with a crime where no such crime exists. Congress authorized the President to make it a crime to export or import certain *"items"* without a license, punishable by two years in prison, a $100,000 fine, or both. Until such items have been properly designated, no crime exists. There can be endless esoteric discussion as to what is or is not an item and what is or is not a classification or category of items. However, "countermeasures" clearly is not an item, but a category or classification which includes a variety of items. Therefore, the unlicensed export of "countermeasures" does not fall within the proscriptions of the Act. Since the defendants in this matter are thus charged with an act that does not constitute a crime, the court has no alternative but to dismiss the indictment. Such result is particularly mandated where Congress has conferred upon the Executive branch the power to decree what shall constitute a crime, and has sought to assure that the notice thereby afforded would be adequate. If the Executive does not exercise that authority precisely as Congress has authorized, the conduct of persons who wish to be law-abiding may therefore be placed in jeopardy.

There is a far greater danger to a free society in construing a criminal statute too broadly rather than too narrowly. One should not be indicted, tried, and possibly convicted and punished for a crime which does not clearly exist or whose enactment has not been accomplished in a manner authorized by Congress.

The dismissal of the indictment is thus compelled not only by the fact that one cannot be charged with a criminal violation where his or her acts do not constitute a crime, but by the principle of separation of powers that underlies our constitutional system as well. Congress has conferred upon the Executive the power to decree what shall constitute a crime under the Act, but has decreed that such authority be exercised in a particular manner. Here, the Executive has failed to exercise his authority in the manner set forth by the statute. As the Executive's authority is limited to that conferred by statute, or the Constitution, such actions beyond his delegated powers must be nullified. To hold otherwise would be to sanction disobedience of the legislature, disobedience which is all the more impermissible where the result thereof is to render certain conduct criminal without the notice specifically authorized by Congress.

Defendants' motion to dismiss the indictment is hereby granted. An appropriate order will issue.