**UNITED STATES of America, Appellant,**

v.

**Da-Chuan ZHENG, Kuang-Shin Lin, Jing-Li Zhang, David Tsai, Allen Yeung, Appellees.**

No. 84–5693.

United States Court of Appeals, Third Circuit.

Argued May 1, 1985.

Decided July 19, 1985.

Rehearing and Rehearing In Banc Denied Aug. 27, 1985.

---

Robert J. Fettweis, Asst. U.S. Atty. (argued), W. Hunt Dumont, U.S. Atty., Newark, N.J., for appellant.

Robert E. Margulies (argued), Margulies, Margulies & Wind, Jersey City, N.J., for appellee Kuang-Shin Lin.

John B. Livelli (argued), Robinson, Wayne, Levin, Riccio & La Sala, Newark, N.J., for appellee Da-Chuan Zheng.

Susan V. Tipograph (argued), New York City, for appellee Jing-Li Zhang.

Before SEITZ, WEIS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

The government contends that in dismissing an indictment the district court adopted an unduly restrictive definition of the word "items." The term appears in a statute that requires the President to designate "items" to be included on a list of defense articles whose sale and exportation are restricted. We conclude that the list as prepared by the Executive complied with the congressional direction. We will therefore vacate the district court's order.

In a one count indictment, defendants were charged with having conspired to violate the Arms Export Control Act, 22 U.S.C. § 2778 (1982), by arranging for the unlawful purchase and export of "defense articles" included on the United States Munitions List, 22 C.F.R. § 121.01 (1984). Finding that the listing cited by the government did not have the specificity required by the Act, the district court dismissed the indictment.[1]

According to the criminal complaint underlying the indictment, defendants met with an undercover customs agent on several occasions and discussed the purchase of certain high technology equipment, including "English Electric Valve Co. Travelling Wave Tube Amplifier Chains and Watkins-Johnson, Inc. Travelling Wave Tube Amplifiers." After acquisition, these devices were to be shipped to the Peoples Republic of China.

The customs agent informed defendants that the devices "could not be sold without an export license and further that he could not obtain the necessary licensing." Defendants persisted, explaining that they would pay the agent for the risks incurred. After the details of the plan were agreed on, defendants were arrested and charged with conspiracy.

Shortly after arraignment, defendants filed a motion to dismiss, contending that the statute and regulations were impermissibly vague. The government responded that the wave tube amplifiers were "active and passive countermeasures" included on the Munitions List and that defendants were aware that it was unlawful to export the equipment without a license. Concluding that the vagueness issue could not be resolved until certain facts were estab-

---

1. The district court opinion is published at 590 F.Supp. 274 (D.N.J.1984).

lished, the district court deferred ruling on this motion.

Defendants then filed a second motion to dismiss, this time contending that the Munitions List designation "countermeasures" was a generic term which did not comply with the Arms Export Control Act's requirement that the President designate "items." Observing that this argument was conceptually distinct from the vagueness challenge made in the first dismissal motion, the district court examined the merits of the defendants' position.

The court noted that Congress had authorized the President to "designate those items which shall be considered as defense articles, and that once so designated, the items became controlled exports. At the outset of its analysis, the court stated "that the term 'countermeasure' does not constitute an 'item.' " In support of this conclusion, the court set out the dictionary definition of "item" and reasoned that even in the context of the Munitions List, "countermeasures" comprised a " 'group of related particulars and items' and not the 'individual particular or detail' itself." In the court's view, countermeasures "clearly is not an 'item' but a category or classification which includes a variety of items."

The court determined that Congress had used the word "item" to obtain greater particularity in the Munitions List so as to facilitate congressional oversight and "increase the quality of notice available to potential exporters." Holding that the congressional use of "items" required more specificity than the court attributed to "countermeasure and counter-countermeasures," it concluded that the terms were a "nullity," which could not serve as a basis for a crime. Therefore the indictment was dismissed.

On this appeal, the government contends that the district court erred in finding a congressional intent to require a more particularized list, in failing to give appropriate deference to the administrative interpretation, and in misconstruing the plain meaning of the word "items."

At the outset, it is important to put aside the vagueness issue. In their initial motion to dismiss, defendants argued that the statute was unconstitutionally vague because it failed to put them on notice that the wave tube amplifiers were covered by the Arms Export Control Act. The district court carefully analyzed the defendants' contention, which was limited to wave tube amplifiers and not to other articles included on the Munitions List. Thus, defendants did not argue that the statute was vague on its face, but rather that "countermeasures" was too broad a term. The government responded that to anyone dealing in these devices, the designation is unambiguous.

The court declined to rule "absent the resolution of certain disputed facts," commenting that it could not determine before trial "whether or not wave tube amplifiers are reasonably encompassed within the term countermeasure in the eyes of the average arms exporter." The district court's ruling is consistent with *United States v. Swarovski*, 592 F.2d 131 (2d Cir. 1979). In ruling on a similar challenge to the Munitions List the court said: "We are dealing here with a regulation of limited scope aimed at a small and relatively sophisticated group of persons." 592 F.2d at 133.

In passing on the defendants' second motion, the court did not revise its earlier vagueness decision, and consequently, that issue is not before us. We must assume in the present posture of the case that the statute is not unconstitutionally vague in the sense that it failed to give defendants notice that their conduct was illegal. For purposes of this appeal, we also assume without deciding that "Travelling Wave Tube Amplifiers" are "countermeasures."

The district court, however, did change its position on the defendants' assertion that "countermeasures" as designated in the Munitions List did not constitute an "item." In its earlier opinion, the court had said, "This may be true. However, unless such generic categories are under the statute vague, such violation does not

comprise a ground for dismissal of the indictment."

At the time of the first motion, the court did not distinguish between the generic category contention and the vagueness defense. In its opinion on the second motion, the court did separate the two issues. It is to the question of statutory compliance that we now turn.

A brief history of the Munitions List is important in resolving the question presented here. Following World War II and continuing to the present time, Congress enacted a series of statutes providing economic and military aid to foreign countries, as well as regulating exports and imports of military and naval equipment. Some provisions pertain to country-to-country sales, others only to commercial transactions. Most of the legislation has no direct bearing on the issues presented in this case but only serves to establish the framework in which the few relevant provisions must be placed.

The Mutual Security Act of 1954, 68 Stat. 832, marked the beginnings of the United States Munitions List. Section 414 of that Act entitled "Munitions Control" authorized the President to control the commercial import and export of "arms, ammunition, and articles of war." To implement the legislation, the President was empowered to "designate those articles which shall be considered as arms, ammunition, and implements of war, including technical data relating thereto, for purposes of this section." 68 Stat. 848.

In 1968, Congress enacted the Foreign Military Sales Act, 82 Stat. 1320, requiring, *inter alia,* that the Secretary of State report all exports "of significant defense articles on the United States munitions list." 82 Stat. 1326. Although the reporting requirement was new, Congress expressly disclaimed any intention to affect § 414 of the 1954 Act. 82 Stat. 1326. Also, it should be noted that throughout the 1968 Act, Congress used the term "defense articles and defense services" instead of "arms, ammunition, and implements of war." *See* 82 Stat. 1322–25.

The Foreign Military Sales Act in turn was revised by the Arms Export Control Act of 1976, 90 Stat. 729, the legislation underlying the indictment in the case at hand. Section 414 of the Mutual Security Act of 1954 was repealed, 90 Stat. 745, but the President's authority to control commercial imports and exports through the use of the Munitions List was re-enacted as § 38, 90 Stat. 744, with some changes in the statutory language. The President was authorized to "designate those items which shall be considered as defense articles and defense services ... and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the United States Munitions List." 90 Stat. 744, *currently codified* at 22 U.S.C. § 2778(a) (1982).

The Act does not define "items" but does define "defense articles and defense services." For purposes of "commercial exports subject to the provisions of § 38 of this Act," 22 U.S.C. § 2778, the term "defense articles and defense services" means "those items designated by the President pursuant to subsection (a)(1) of [§ 38]." 90 Stat. 747, *codified* 22 U.S.C. § 2794(7) (1982).

The revision of the statutory language from "arms, ammunition and implements of war" to "defense articles and defense services" resulted from the terminology used throughout the 1968 Act. A Senate Report commented, "This change is merely intended to conform section 38 to the style of the other sections of the Act. It is not intended to alter the scope of items subject to export control, or the extent of such control, under the regulations authorized by this Bill." S.Rep. No. 876, 94th Cong., 2d Sess. 42, 1976 *reprinted in* Senate Misc. Reports on Public Bills V.

Another feature of the Arms Export Control Act is its express provision for the preservation of existing regulations. "All determinations, authorizations, regulations, ..., and other actions issued ... under section 414 of the Mutual Security Act of 1954 shall continue in full force and effect

**522**

until modified, revoked, or suspended by appropriate authority." 90 Stat. 745.[2] Thus, the existing Munitions List was to continue in effect.

At the time of the events described in the indictment, the List began by stating, "the following articles are hereby designated as arms, ammunition, and implements of war."[3] The List is organized into 22 "categories," which are designated by roman numerals. Important to the case at hand is "Category XI—Military and Space Electronics." Subsection (a) reads in part, "Electronic equipment ... including but not limited to the following *items:* (emphasis added)

(1) Underwater sound equipment including long towed arrays ... search, acquisition, tracking, moving target indication and imaging radar system; *active and passive countermeasures, counter-countermeasures;* electronic fuses, identification systems; command, control and communication systems, and regardless of designation, any experimental or developmental electronic equipment specifically designed or modified for military application, or for use with a military system...." (Emphasis added).

The word "items" is not defined by the regulations but appears in several places. A footnote to Category VI discussing the licensing for export of a nuclear propulsion plant refers to it as an "item." Categories XI(d), XII(c), & XVI(b) refer to components, parts, etc. "except such items as are in normal commercial use." Similar references are made in the other categories, except that at times the word "article" is used instead of "item." *See* Categories IV, IX, X, & XIV.

Section 121.15 defines "end-items" as assembled systems or equipment requiring only fuel or ammunition for operation and which consist of components. "Components are items which are useful only in conjunction with an end-item."

Section 121.16 states that "items in a partially completed state such as forgings, castings ... of any of the articles enumerated on the Munitions List ... where they are identifiable as ... implements of war are considered to be such articles...."

Some observations should be made at this juncture. First, the word "items" appears not only in the enabling statute but in the regulations through which the power conferred has been exercised. Also "articles" and "items" are used almost interchangeably in the Munitions List. Finally, the use of "items" in the regulations was the same before and after 1976 when the Arms Export Control Act substituted "items" for the term "articles" that had appeared in the 1954 Act.

Rather than reading the minor word substitution as signalling a substantial but unarticulated shift in congressional policy as did the district court, we think a more modest explanation is the correct one. Congress did not choose the language in a vacuum, but made the change in the course of amending portions of the Mutual Security Act—a 22-year-old statute which had developed its own appendage of regulations. The Munitions List had been in existence for many years, and Congress referred to it specifically in the Arms Export Control Act in 1976. Consequently, there is no doubt that Congress was well acquainted with the format of the List and the terminology it employed.

As noted earlier, the List used the words "articles" and "items" almost interchangeably. It is not surprising then, nor do we consider it significant, that the word

---

**2.** The authority to designate the materials for inclusion on the Munitions List was delegated to the Secretary of State in 1954, *see* Exec. Order No. 10575, 3 C.F.R., 1954–1958 Comp., p. 213, 214, and this practice has continued, Exec. Order No. 11958, 42 Fed.Reg. 4311 (January 18, 1977). The List, codified at 22 C.F.R. § 121.01 (1984), has been revised recently. *See* 49 Fed. Reg. 47682 (December 6, 1984).

**3.** The recent revision has changed this language to conform to the statutory wording of "defense articles and defense services." 49 Fed.Reg. at 46687. *See also* 50 Fed.Reg. 12787 (April 1, 1985) (technical amendments).

"items" was selected to replace "articles" when Congress changed the designation of "arms, ammunition, and implements of war" to "defense articles and defense services." Adoption of terms used in the regulations or avoidance of repetition in the same sentence are far more likely reasons for substitution of the words than is the announcement of the major policy change, which the district court perceived.

The legislative history of the 1976 Act does not demonstrate any congressional dissatisfaction with the use of the word "item" in the List nor any disagreement with the degree of specificity.[4] The histories of the earlier statutes, the Mutual Security Act and the Foreign Military Sales Act, similarly are silent.

As the district court found, legislative developments since 1976 express an increased congressional interest in monitoring export controls. The President has been directed to exercise his authority under § 38 to achieve coordination with export controls authorized under the Export Administration Act of 1979. 50 U.S.C.App. § 2416(b); 22 U.S.C. § 2778(e). But we must observe that although greater precision in the Munitions List would facilitate reporting as well as legislative oversight, Congress has not directed the President to be more particular in designating "defense articles" nor has it even addressed the contents of the List. Accordingly, we do not agree with the district court's assumption that these later legislative developments have great significance in demonstrating the degree of specificity the word "items" connotes.

■ In most situations, the plain language rule is the preferred method of statutory interpretation. *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). However, when the subject matter is a technical one and is entrusted to the executive, the general understanding must yield if a differing agency interpretation is reasonable and does not contradict the expressed intent of Congress. *Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.*, —— U.S. ——, ——, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *Adamo Wrecking Co. v. United States*, 434 U.S. 275, 98 S.Ct. 566, 54 L.Ed.2d 538 (1978).

■ In the case at hand, the dictionary definition relied on by the district court is of little value because "items" is a relative term whose contours are constructed by context. Only when measured by the remaining particulars in a given classification can one discern whether a designation is an item. Thus, we are left, as was the President, with determining the meaning of "items" as used in the statute without an accompanying list of associated particulars. That being so, reasonable persons could differ on the degree of specificity inherent in the term.[5]

Absent even a clue from Congress on how much precision was to be used in preparing the Munitions List, the President should be given wide latitude in interpreting the delegation of authority and formulating regulations. Implicit in the descriptions used to designate the "defense articles and defense services" is an Executive conclusion that specific nomenclature was not required and that more generic identification was acceptable.

Because we can find no contrary suggestion in the legislation or its history, the question is whether the "agency's answer

---

**4.** Although subsequent legislative developments are not considered especially probative, we note that in the International Security Act of 1980, 94 Stat. 3137, Congress' use of "items" is consistent with the breadth attributed to the term by the President in the Munitions List. Section 108 of the 1980 legislation is captioned "Export Controls on Certain Items on the Munitions List." It then refers in several instances to "defense articles and defense services on the United States Munitions List." 94 Stat. 3137.

**5.** It is interesting that the dictionary does contain a much simpler explanation of the word that corresponds to our more detailed exposition. "Item applies chiefly to each thing in a list of things or in a group of things that lend themselves to listing." Websters Third International Dictionary (1968).

is based on a permissible construction." *Chevron,* — U.S. at ——, 104 S.Ct. at 2782. Given the limited nature of the inquiry, we cannot say that "items" demands more precision than that discerned by the President. Indeed, as we have already observed, it appears that the more plausible explanation for the Congressional choice of "items" was consistency with the use of that term in the Munitions List.

According some deference to the Executive in this circumstance does not interfere with the principle that criminal statutes are to be narrowly construed. Strict construction does not mean that every federal criminal statute must be given the narrowest possible meaning. *See Barrett v. United States,* 423 U.S. 212, 96 S.Ct. 498, 46 L.Ed.2d 450 (1976); *United States v. Campos-Serrano,* 404 U.S. 293, 92 S.Ct. 471, 30 L.Ed.2d 457 (1971).

Nor does *Adamo Wrecking Co. v. United States,* 434 U.S. 275, 283, 98 S.Ct. 566, 571, 54 L.Ed.2d 538 (1978), suggest a contrary conclusion. That case, while it supports the proposition that the President's mere designation of "countermeasures" and "counter-countermeasures" as "items" is insufficient "to foreclose further inquiry," also reaffirms the principle that deference to the executive "is entirely appropriate under ordinary circumstances." *Id.* at 288, 98 S.Ct. at 575. Furthermore, we are not dealing with a possible absence of executive power.

There is no dispute in this case about whether the wave tube amplifiers could be placed on the List. Thus, unlike cases applying strict construction to avoid extending the reach of a criminal statute, here the principle "is not violated by permitting the words of the statute to have their full meaning, or the more extended of two meanings." *United States v. Hartwell,* 73 U.S. (6 Wall) 385, 396, 18 L.Ed. 830 (1867). *See also Marshall v. Stoudt's Ferry Preparation Co.,* 602 F.2d 589, 592 & n. 4 (3d Cir.1979) (A "word means what the statute says it means," and "That the law should attribute expansive and sometimes even bizarre meanings to a word is not a novel phenomenon.")

Even if we were dubious about the reasonableness of the President's more expansive interpretation of "items" and were inclined to give that term a narrower meaning, the present record does not demonstrate that "countermeasures and counter-countermeasures" do not constitute items.

Category XI lists highly specialized electronic equipment used for particular military purposes. In that context "countermeasures" obviously has some meaning peculiar to that category and is shaped by its technical environment.

In the 1975 version of the Munitions List, Category XI(a) read, "Electronic equipment assigned a military designation including but not limited to, the following items: radar, active and passive countermeasures, counter-countermeasures...." In 1977, the category was amended as quoted earlier to list various sonar devices and more specific types of radar, again followed by "countermeasures." Thus, the listing suggests that countermeasures is a term of art having reference to radar.

We have little doubt that had "radar jamming devices" been used instead of "countermeasures," the district court would have accepted that designation. On the present record, we are not satisfied that in the military electronics field "countermeasures" does not mean radar jamming devices and hence is as much an "item" as a nuclear propulsion plant. In that event the statutory direction has been complied with, and the basis for the defendants' motion falls.

We conclude that "countermeasures" and "counter-countermeasures" are appropriate designations of "items" for inclusion on the Munitions List, and therefore the indictment must be reinstated. Accordingly, the order of the district court will be vacated and the case remanded for further proceedings.